UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JAMES M. WILLIAMS,

                         Plaintiff,

v.                                                          Case No.  5:07-cv-110-Oc-10GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                         Defendant.
_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security

("the Commissioner") terminating his disability insurance benefits (Doc. 1.) The

Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their

respective positions. (Docs. 13 & 14.)  For the reasons discussed below, the

Commissioner's decision is due to be **REVERSED and REMANDED** under sentence

four of 42 U.S.C. §405(g)**.**

## I.  PROCEDURAL HISTORY

On March 5, 1993, Plaintiff filed an application for a period of disability and

disability insurance benefits. (R. 46-50.)  His application was denied initially and on

reconsideration.  (R. 51-56.)   Plaintiff requested a hearing before an Administrative Law

Judge.  (R. 57.)  On October 25, 1994, Plaintiff was awarded benefits by Administrative

Law Judge ("ALJ") Ruben Figueroa.  (R. 343-54.)  ALJ Figueroa found that Plaintiff met

the requirements of Listing 12.04. (R. 349.)

Plaintiff's disability status was re-evaluated, and it was determined initially and upon reconsideration that Plaintiff had experienced medical improvement and that his disability ceased April 1, 1998 with benefits terminating effective June 1998.  (R. 357-59.)  Plaintiff requested a hearing, which was conducted by ALJ Holder on August 18, 2000.  (R. 24-43, 367.)    ALJ Holder issued a decision unfavorable to Plaintiff on September 28, 2000. (R. 9-16.)  The Appeals Council denied Plaintiff's request for review of the hearing decision.  (R. 3-4.)   Plaintiff then appealed to this Court. (Case Number 5:02-cv-238-Oc-GRJ.)

On September 5, 2003, the Court granted the Commissioner's motion to remand the case back to the Commissioner for further proceedings.  (R. 634-36.)  On November 19, 2003, the Appeals Council vacated the decision and remanded the case back to ALJ Holder for further proceedings consistent with the Court's order. (R. 638-40.)  A supplemental hearing was held on June 17, 2004 (R. 656-83).  On August 11, 2004, ALJ Holder issued another decision unfavorable to Plaintiff. (R. 613-23.)  On January 25, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 602-04.)  Plaintiff then filed the instant appeal.

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such

---

[1] <u>See</u> 42 U.S.C. § 405(g).

relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her

---

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to

---

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such

---

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] Walker at 1003.

[19] Wolfe at 1077-78.

evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD EVIDENCE

#### A.    Evidence Considered By ALJ Figueroa

The copy of ALJ Figueroa's decision included in this record, does not include any discussion of specific medical records.  (R. 343-54.)  However, the record shows that the following medical evidence was in the record for his consideration.

On April 19, 1989, Plaintiff was referred to Oregon K. Hunter, M.D. for an independent medical evaluation.  (R. 148-52.)  Plaintiff's chief complaint was "low back pain to the left leg down to the foot."  Dr. Hunter's impression was chronic low back pain with left sciatica, but he ordered further testing because he suspected degenerative disc disease and possible nerve root irritation.  Plaintiff subsequently was treated by Dr. Hunter for complaints of chronic low pain until July 16, 1993. (R. 113-147.)   Dr. Hunter recommended home exercise and other conservative treatments.

X-rays of the right ankle showed minimal posterior calcaneal spurring and the right knee were negative.  (R. 155.)  X-rays on January 3, 1990 of the left shoulder, cervical spine and left wrist were negative.  (R. 154.)  A lumbar MRI on July 13, 1990 showed mild degeneration of the L4-5 and L5-S1 discs without evidence of focal disc herniation. (R. 153.)

---

[20] See id.

Dr. Hunter referred Plaintiff to Philip K. Springer, M.D. for psychiatric evaluation on February 1, 1990.  (R. 200-04.)  Dr. Springer believed that the results of the examination are reliable and valid.  He characterized Plaintiff as depressive and diagnosed Plaintiff with generalized anxiety disorder, recurrent; rule out major depressive disorder; and chronic back pain syndrome.  Dr. Springer administered a MMPI on February 20, 1990. (R. 192-99.)  He began participation in the pain recovery group on February 22, 1990 and also individual psychotherapy. (R. 188.)  On August 20, 1990, Plaintiff was hospitalized for nine days with a diagnosis of major depression secondary to a chronic pain syndrome. (R. 211-15.)   Leading up to the hospitalization, there had been deterioration of Plaintiff's condition, extreme exhaustion, worsening of depression with intermittent suicidal ideation.  After discharge, Plaintiff continued participation in the pain recovery group and was seen for individual psychotherapy at the Springer Group. (R. 156-89.)

 On May 12, 1991, a non-examining state agency physician, Reuben E. Brigety, M.D. completed a RFC Assessment.  (R. 91-98.)  He found that Plaintiff could frequently lift 25 pounds and occasionally lift 50 pounds; stand and/or walk and sit about 6 hours in an 8-hour workday; and push and pull without limitation.

A September 3, 1992 MRI of the lumbar spine showed minimal midline bulging of the L5-S1 disc with no other abnormality seen.  (R. 266.) A MRI of the cervical spine showed possible minimal right-sided disc herniation at C5-C6 of uncertain significance. (R. 265.)

On October 4, 1992, Plaintiff was seen by Charles David Nach, M.D., for complaints of injury to his left hand.  (R. 257-59.)  Dr. Nach diagnosed Plaintiff with

bilateral myofascitis, left costo scapular syndrome, herniated disc cervical spine and ganglion cyst left wrist.

On April 30, 1993, Plaintiff was seen by D.P. Raju, M.D. for a consultative evaluation.  (R. 267-68.)  Dr. Raju's impression was chronic back pain syndrome, probably underlying anxiety-hyperventilation causing shortness of breath and acid peptic disease of the stomach controlled with medications.

On May 4, 1993, Allen Hodges, Ph.D. performed a consultative evaluation of Plaintiff.  (R. 515-16.)  Plaintiff reported breathing problems upon exertion, leg and back pains, severe headaches, neck pain, ulcers, ejaculatory problems with pain, dizziness, nausea, fluttering heart, joint pains, sleep problems, narcolepsy, and restlessness.   Dr. Hodges noted that Plaintiff had been previously hospitalized for major depression in 1990 after contemplating suicide and has continued on a weekly basis with the Springer Pain Management Group.  Plaintiff denied any subsequent suicidal ideation.  Plaintiff's diagnostic impression was somatization disorder; major depression, recurrent in partial remission; rule out obsessive compulsive personality disorder; and chronic low back syndrome with degenerative disc disease.   Plaintiff's prognosis was guarded.

On May 17, 1993, a non-examining state agency psychologist, Henry D. Bates, Ph.D. performed a Mental RFC Assessment (R. 99-102) and Psychiatric Review Technique.  (R. 103-12.)  Bates opined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to set realistic goals or make plans independently of others.   Bates found that Plaintiff's affective disorders, anxiety-related disorders and somatoform disorders did

not meet or equal a listed impairment.   He noted slight restriction of activities of daily living, slight difficulties in maintaining social functioning, often deficiencies of concentration, persistence or pace resulting in failure to complete tasks in timely manner and one or two episodes of deterioration or decompensation.

On August 30, 1994, Dr. Springer completed a Psychiatric Evaluation in which he found that Plaintiff had a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings or guilt or worthlessness, and difficulty concentrating or thinking. (R. 331-42.) Dr. Springer found that Plaintiff had moderate restrictions of activities of daily living and moderate difficulties in maintaining social functioning and had exhibited deficiencies of concentration, persistence of pace resulting in failure to complete tasks in a timely manner and episodes of deterioration or decompensation in work or work-like settings.

### B.  Evidence After ALJ Figueroa's Finding Of Disability

Plaintiff continued treatment with Dr. Hunter through January 8, 1997 for chronic neck and back pain.  (R. 461-73.)  Dr. Hunter prescribed physical therapy and home exercise and encouraged Plaintiff to control his symptoms without medication.

On March 6, 1998, Lawrence R. Fields, D.O. performed a consultative physical examination.  (R. 489-505.)  Plaintiff had decreased range of motion of the thoracolumbar spine, especially forward flexion.  Plaintiff had full range of motion in all joints.  He had positive straight leg raising at 90 degrees in the supine position at 120 degrees in the sitting position on the left only.  His grip strengths were 5+ with normal fine manipulations.  Sensory findings were grossly intact.  Deep tendon reflexes were 2+/4.  There was no evidence of motor deficit.  Plaintiff had a normal gait and was able

to perform heel, toe and tandem walking.  Based on his clinical findings. Dr. Fields'
impression was cervical and thoracolumbar muscle strain; questionable neuropathy of
the lower extremities, and depression.  X-rays of the lumbar spine showed alignment
within normal limits with no compression deformity of the vertebral bodies.  Discs were
of adequate thickness at all levels and the facet and S1 joints were normally contoured.
A left knee x-ray was normal with no active disease findings.

On March 10, 1998, David M. Bortnick, Ph.D, Psy.D. performed a consultative
mental status evaluation.  (R. 506-08.)  Dr. Bortnick diagnosed Plaintiff with Adjustment
Disorder With Depressed Mood, By History, In Partial Remission and opined that
Plaintiff could perform work or work-related activities without any psychological
restrictions.

On March 17, 1998, Henry D. Bates, Ph.D.a non-examining state agency
psychologist completed a psychiatric review technique in which he found that Plaintiff
had an adjustment disorder with depressed mood in partial remission that was not
severe and resulted in only slight limitations of activities of daily living, slight difficulties
in maintaining social functioning and slight deficiencies of concentration, persistence or
pace resulting in failure to complete tasks in a timely manner.   (R. 451-60.)

On April 26, 1999, Plaintiff was seen by Dr. Hodges for a consultative evaluation.
(R. 517-18.)  Plaintiff complained of constant pain in hips, shoulders, back; poor
memory functioning, says he forgets even his children's names; and depression with
occasional thoughts of suicide, particularly bad in winter.  Dr. Hodges noted that Plaintiff
was difficult to interview, claiming to not remember specifics as to time, place and dates.
Plaintiff evidenced some attention problems which he attributed to constant pain;

10

remote memory appeared to have gaps and he reports severe problems with immediate
memory.  Plaintiff's mood was anxious.  Dr. Hodges noted that Plaintiff "may well suffer
delusions concerning his physical condition."   He "very tentatively" diagnosed Plaintiff
with dysthymic disorder; rule out major depressive disorder, by history; pain disorder
with both psychological factors and a general medical condition; rule out obsessive
compulsive personality disorder; and claims a physical diagnosis of fibromyalgia by
whom, under what conditions are not known.   Dr. Hodges noted that Plaintiff's
prognosis for returning to work is guarded.

Based on Plaintiff's complaints of poor memory, Plaintiff was referred for
neuropsychological screening with emphasis on memory functioning, which Dr. Hodges
performed on June 21, 1999.  (R. 513-14.)   Dr. Hodges administered the Wechsler
Memory Scale I, Russell Revision and Plaintiff's score was within normal limits,
suggesting overall average memory functioning.  However, Plaintiff's immediate
memory for verbal material presented orally is on the "severely impaired level" while
delayed memory for verbal material is "moderately impaired."   Immediate and delayed
visual memory is above average.  Plaintiff reported that his memory problems result
from pain.  Dr. Hodges opined that Plaintiff's blockage of ability to remember verbal
material lies in the emotional domain or is the product of severe pain.  Dr. Hodges noted
that Plaintiff presented in 1993 with over 13 somatic complaints and using DSM IV
criteria, those would warrant a diagnosis of somatization disorder.  Dr. Hodges
explained that Plaintiff's current complaint of fibromyalgia "encompasses these
complaints."

11

On May 26, 1999, Plaintiff was referred to Robert G. Panzer, D.O. for a consultative physical evaluation.  (R. 509-12.)  Plaintiff reported that he controls pain with over-the-counter medications, massage therapy, TENS unit and heating pads.  On examination, there were no obvious deformities noted in a detailed joint evaluation, and no swelling, heat or redness. Dr. Panzer noted full cervical flexion and extension; lateral flexion was full on the right and 30 degrees on left; and rotation is full on the right and to 50 degrees on left.   Plaintiff had normal dexterity and grip strength on the right was 4/5 and left was 3/5.  Strength in lower extremities was 4/5 on the right and 3/5 on the left.  Plaintiff had a normal tandem gait.  Dr. Panzer's assessment was fibromyalgia, a history of degenerative disc disease, chronic pain syndrome, depression and a lipoma on the right neck.

On June 29, 1999, Steven L. Wise, a non-examining state agency psychologist completed a Mental RFC Assessment and found only moderate limitations in Plaintiff's ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 426-29.)  Wise also completed a Psychiatric Review Technique in which he found that Plaintiff had a dysthymic disorder, somatoform pain disorder with chronic pain based on psychological factors and a general medical condition resulting in slight limitations of activities of daily living; slight difficulties in maintaining social functioning; often deficiencies of concentration,

persistence or pace resulting in failure to complete tasks in a timely manner; and no episodes of deterioration or decompensation.  (R. 432-40.)

From November 1994 through April 14, 2000, Plaintiff was treated by the Springer Group, a psychiatry and pain management practice. (R. 533-601.)    On April 10, 1997, Plaintiff reported feeling "fairly good regarding [his] mental health and contentment."  Dr. Springer noted that Plaintiff "used to feel really bad, but now he feels good," although he noted that chronic pain remained a significant problem.  On September 1, 1999, Plaintiff returned after a 2-year hiatus and was very depressed and tearful and was in pain and allodynia.  (R. 540-41.)  On October 1, 1999, Dr. Springer noted that Plaintiff's chronic pain is still a significant problem and his mental health "could use a lot of improvement."  (R. 538-39.)  On December 10, 1999, Dr. Springer noted that chronic pain remains a significant problem but that his mental health appears to be higher than Plaintiff reported.  (R. 536-37.)  On April 14, 2000, Plaintiff reported a small improvement in his mental health and Dr. Springer noted that his overall mental health had improved significantly from prior reports, however he also noted that chronic pain is still a significant problem.  (R. 533-34.)

On August 9, 2000, Dr. Springer completed a Mental RFC Assessment (R. 525-32.)  He found that Plaintiff had marked limitations in his ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the

13

general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.  Dr. Springer noted moderate limitations in the ability to understand and remember very short and simple instructions; to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to make simple work-related decisions; to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Finally, Dr. Springer found mild limitations in Plaintiff's ability to ask simple questions or request assistance.  In explaining these findings, Dr. Springer noted that chronic pain was high and interfered with concentration, memory and causes fatigue.

Dr. Springer also completed a form entitled "Clinical Assessment of Pain" in which he noted that Plaintiff had repeatedly reported severe profound pain that is virtually incapacitating so that Plaintiff cannot perform most activities of daily living and could not perform at work; that from an objective standpoint, a person with Plaintiff's diagnosis would be expected to experience this degree of pain; and that based on his objective findings and Plaintiff's subjective reporting, Dr. Springer rated Plaintiff's pain as severe profound pain that is virtually incapacitating so that Plaintiff cannot perform

most activities of daily living and could not perform most activities at work. (R. 528-32.)
Dr. Springer further noted that with pain medications, Plaintiff would still experience
marked pain which interferes with concentration, persistence, and pace and prevents
Plaintiff from completing tasks relating to the activities of daily living and would prevent
Plaintiff from completing tasks at work and that moderate side effects can be expected,
which will only mildly interfere with Plaintiff's concentration, persistence and pace in
performing activities of daily living or work.  When asked how he would expect a job that
allowed Plaintiff to alternately sit or stand at will to effect Plaintiff's level of pain, Dr.
Springer responded that marked increased pain is likely to occur to such a degree as to
prevent the patient form alternately sitting and standing at will for more than 3 to 4 hours
a day, 5 days a week.  When asked how he thought a job that required Plaintiff to walk
would effect Plaintiff's level of pain, Dr. Springer responded that marked increased pain
is likely to occur to such a degree as to prevent Plaintiff from walking for more than 3 to
4 hours a day, 5 days a week.

On June 16, 2004, Thomas E. Lafferty, M.D. completed a pain assessment
questionnaire in which he stated that he had treated Plaintiff since December 1, 2001.
(R. 650-55.)  Dr. Lafferty reported that Plaintiff had repeatedly reported pain and that
from an objective standpoint, someone with his diagnosis would be expected to
experience pain.  He stated that Plaintiff's pain was somatogenic, nociceptive and
continuous.   Dr. Lafferty stated that Plaintiff had chronic pain syndrome and was being
medicated for his pain with both opioid/synthetic opiod and nonopioid medications,
which could be expected to cause stomach upset and dizziness.  Dr. Lafferty stated that
Plaintiff suffers from depression or anxiety related to his pain and that he is self-

medicating with St. Johns Wort.  Dr. Lafferty said that Plaintiff is subjectively reporting

extreme pain; however, based on Plaintiff's subjective complaints and his objective

findings, Dr. Lafferty rated Plaintiff's pain as moderate – i.e., pain that interferes with

concentration, persistence and pace and prevents Plaintiff from completing tasks

relating to the activities of daily living without frequent (hourly) interruptions for pain

relief; and, that assuming an 8 hour work day 5 days a week (with a 10-15 minute break

in the morning and a 10-15 minute break in the afternoon and a 30 minute lunch break)

would prevent the patient from completing tasks at work without frequent breaks or

interruptions for pain relief. Finally, Dr. Lafferty noted marked restrictions in Plaintiff's

ability to complete a normal workday and workweek without interruptions from pain and

to perform at a consistent pace without an unreasonable number and length of rest

periods; moderate restrictions in the ability to perform activities within a schedule,

maintain regular attendance and be punctual within customary tolerances; and mild

restrictions in his ability to maintain attention and concentration for extended periods,

i.e., more than 5-10 minutes at a time and in his ability to interact appropriately with the

general public.  Dr. Lafferty noted that Plaintiff may benefit from massage therapy, anti-

depressants and a psychology//psychiatry referral.

At the June 17, 2004 hearing, Plaintiff was 48 years old.  (R. 659.)  Plaintiff

testified that he has an eleventh-grade education and past relevant work as a

groundskeeper and an RV repairman.  (R. 660-63.)  Plaintiff testified that he cannot

work due to all over pain and depression.  (R. 664.)  Plaintiff testified that he can walk

for about 15 minutes before he gets extremely tired, with pain in his legs, back and hips;

sit for about 30 minutes; stand for 15-20 minutes; and some days he only can lift 5

pounds.  (R. 665-66.)  Plaintiff testified that he takes pain medication but he cannot

afford to see a psychiatrist or psychologist.  (R. 666.)   Plaintiff does laundry, cooks

regular meals, takes care of his own hygiene, drives a car, goes to church, waters

flowers in the yard, cleans the house and uses the computer.  (R. 667-68, 670, 671-

723)   Plaintiff testified that he thinks about suicide sometimes, has trouble focusing,

gets extremely tired, feels like he doesn't fit in, spends a lot time alone, and has sleep

difficulty (R. 668-70.) Plaintiff testified that he learned different stretches and water

exercise through a therapy class and that he tries to do the exercises every other day.

(R. 671.) Plaintiff testified that sitting in a hot tub makes him feel better.  (R. 670.)

Turning to the ALJ's decision, the Court must look both at his most recent

decision dated August 11, 2004 (R. 613-23) as well as his earlier decision dated

September 28, 2000.  (R. 9-16.)  The September 2000 decision discussed at great

detail ALJ Holder's conclusion that Plaintiff no longer meets Listing 12.04.  When this

Court remanded the case, ALJ Holder was directed to address perceived deficiencies

with his RFC analysis.  Accordingly, although he expressly found that Plaintiff did not

meet Listing 12.04 in the August 2004 decision, his discussion focused on the RFC

analysis.

Based on his review of Plaintiff's testimony and the medical evidence, the ALJ

found that Plaintiff had experienced medical improvement and no longer met Listing

12.04.  (R. 15.)  The ALJ then performed the normal five-step sequential analysis.  The

ALJ determined that claimant suffers from a somatization disorder and dysthymic

disorder, rule out an obsessive compulsive personality disorder, a chronic pain disorder

with both psychological factors and a general medical condition, a large lipoma on his

17

neck, and a history of a diagnosis of fibromyalgia.  (R. 619.)   While these impairments

are severe, the ALJ determined that Plaintiff did not have an impairment or combination

of impairments which met or medically equaled one of the impairments listed in

Appendix 1, Subpart P of Social Security Regulation No. 4.   (Id.)

The ALJ found that Plaintiff retains the physical RFC to perform a very wide

range of light exertional activities.  (R. 622.)  The ALJ found that Plaintiff's nonexertional

impairments stemming from complaints of pain due to fibromyalgia, a depressive

disorder, and a somatoform disorder do not significantly limit his ability to perform

sustained light work activities.  (Id.) After finding that Plaintiff could not perform his past

relevant work, the ALJ used Rule 202.17 of the Medical-Vocational Guidelines (the

"grids")[21] and found that Plaintiff was not disabled (R. 623.)  The ALJ did not consult a

vocational expert.

## IV.   DISCUSSION[22]

### A.    The ALJ properly found substantial medical improvement

Plaintiff argues that the ALJ erred by concluding that he had reached substantial

medical improvement.  A claimant bears the burden of providing evidence that he is

disabled within the meaning of the Social Security Act.[23]  In a cessation of benefits case,

the issue is whether substantial evidence shows that Plaintiff's impairments medically

---

[21] 20 CFR Pt. 404, Subpt. P. App.2 Rules 202.18 and 202.11.

[22]  Plaintiff also argues that the ALJ violated the 11th Circuit pain standard.  However, the Court finds no error in the ALJ's evaluation of Plaintiff's subjective complaints.

[23] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001.)

improved to the point that he is able to perform substantial gainful activity.[24]  Medical improvement is defined as any decrease in the medical severity of Plaintiff's impairments based on changes in the symptoms, signs, and/or laboratory findings associated with Plaintiff's impairments.[25]  The standard for medical improvement and the required sequential evaluation process are outlined in the regulations at 20 C.F.R. 404.1594(b)(5).[26]

Generally, medical improvement relates to a claimant's ability to work if the claimant has had a decrease in the severity of his impairments and an increase in his RFC.  Where as here, the prior finding of disability was based on Plaintiff's impairments meeting or equaling a listed impairment, the Plaintiff's RFC was not assessed.  Under these circumstances, a finding that Plaintiff's medical improvement relates to his ability to work would be made if the claimant's impairments no longer meet or equal the same

---

[24] See 42 U.S.C. 423(f); 20 C.F.R. 404.1594(a).

[25] 20 C.F.R. 404.1594(b)(1), (C)(1); see also, 20 C.F.R. 404.1528

[26] The steps in the process are:
1.  Does the claimant have an impairment which meets or equals the severity of an impairment listed in Appendix 1?
2.  If not, has there been medical improvement as shown by a decrease in severity?  If so, see step 3, otherwise, go to step 4.
3.  If there has been medical improvement, is it related to the claimant's ability to work?
4.  If there has not been medical improvement or if the medical improvement is not related to the ability to do work, do any exception(s) to the medical improvement standard apply?
5.  If there has been medical improvement related to the ability to work, or if one of the exceptions applies, does the claimant have a severe impairment or combination of impairments?
6.  If the claimant has a severe impairment, does the claimant have the RFC to perform his/her past relevant work?
7.  If not, does the claimant have the RFC and vocational factors to   perform other work?

listing.[27]  If medical improvement is established and is related to Plaintiff's ability to work, the ALJ will decide if Plaintiff's current impairments are severe.  The ALJ then will assess Plaintiff's current RFC and determine if Plaintiff can do his past relevant work or other work.

In his decision dated October 25, 1994, ALJ Figueroa found that Plaintiff's affective disorder, the residuals of a back injury with chronic back pain syndrome, and a somatoform disorder met the requirements of Listing 12.04.  (R.347-50.)  ALJ Figueroa explained:

> The claimant's depressive syndrome is characterized by a sleep disturbance, decreased energy, difficulty concentrating or thinking, and thought of suicide.  His mental condition results in marked restriction of activities of daily living, marked difficulties in maintaining social functioning, and frequent deficiencies of concentration, persistence or pace, but he never has episodes of deterioration or decompensation in work or work-like settings.

Accordingly, October 25, 1994 represents the comparison point date.

The Court finds that ALJ Holder properly determined that Plaintiff experienced medical improvement in his impairments since October 25, 1994, the date of the favorable determination and that the improvement was related to his ability to work. While Plaintiff had previously been found to meet Listing 12.04, the ALJ appropriately found that Plaintiff's impairments no longer met or equaled any listed impairment.[28] Plaintiff does not argue that he meets Listing 12.04; instead he argues that ALJ Holder's "finding is based on more or less the same medical evidence and the record shows

---

[27] 20 CFR 404.1594(c)(3)

[28]  20 C.F.R. Part 404, Appendix 1 to Subpart P.

treatment at all relevant times for depression and pain [Plaintiff's] disability is res

judicata."[29]

Contrary to Plaintiff's suggestion, the ALJ relied on numerous medical records

they were not considered by ALJ Figueroa.    Indeed, in finding that Plaintiff no longer

meets Listing 12.04, the ALJ specifically discussed treatment records from Dr. Hunter

and Dr. Springer as well as consultative evaluations by Dr. Hodges, Dr. Fields, Dr.

Bortnick, and Dr. Panzer and evaluations by non-examining state agency physicians

and psychologists.  All these records were dated after October 25, 1994, and thus, were

not considered by ALJ Figueroa.  Moreover, while the records show that Plaintiff

consistently was treated for pain and depression, the ALJ's finding that Plaintiff's

impairments did not meet Listing 12.04 was supported by substantial record evidence.

## B.    The ALJ Erred By Applying The Grids

Plaintiff argues that the ALJ erred by relying solely on the grids without the

testimony of a vocational expert in light of Plaintiff's mental health issues.[30]   Because

the ALJ found that Plaintiff could not return to his past relevant work, the burden of proof

shifted to the Commissioner to establish that the claimant could perform other work that

exists in the national economy.[31]  The burden of showing by substantial evidence that a

person who can no longer perform his former job can engage in other substantial gainful

activity is in almost all cases satisfied only through the use of vocational expert

---

[29] Doc. 13 at 7-8.

[30] Plaintiff also contends that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain. The Court finds no error in the ALJ's evaluation of Plaintiff's subjective complaints of pain.

[31] See Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

testimony.[32]  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.[33] Exclusive reliance on the "grids" is not appropriate "*either* when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills."[34]  If either condition exists, the ALJ is required to consult a vocational expert.[35]

Here, instead of requiring the testimony of a vocational expert to assess the impact of Plaintiff's nonexertional impairments, the ALJ relied solely on the grids to determine that Plaintiff was not disabled.  This was based on the ALJ's conclusory finding that Plaintiff's capacity to perform a wide range of light  work is "substantially intact and has not been significantly compromised by his symptoms of pain, depression and somatization (R. 18.).  However, in reaching this conclusion the ALJ failed to discuss  what impact Plaintiff's nonexertional limitations would have on the sedentary occupational base.

Plaintiff argues that the ALJ was required to consult a vocational expert based on his finding at step 2 that Plaintiff's severe impairments were depression and chronic low

---

[32] See id.

[33] See id.

[34] See Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004)(quoting Francis v. Heckler, 749 F.2d 2565, 1566 (11th Cir. 1985.)

[35] See id.

back pain.[36]  However, contrary to Plaintiff's argument, depression and pain are symptoms that may or may not cause functional limitations.[37]

ALJ Holder appears to have dismissed the opinions of Plaintiff's treating physicians, Dr. Springer and Dr. Lafferty regarding Plaintiff's non-exertional limitations. In his August 9, 2000 Mental RFC Assessment (R. 525-32), Dr. Springer found that Plaintiff had marked limitations in his ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods;  to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. Dr. Springer noted moderate limitations in the ability to understand and remember very short and simple instructions; to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to make simple work-related decisions; to complete a normal workday or workweek without interruptions from psychologically based symptoms and

---

[36] See Doc. 13 at 5.

[37] 20 CFR §404.1528(a), §404.1529(a), §404.1545(a).

to perform at a consistent pace without an unreasonable number and length of rest periods; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Dr. Springer also found mild limitations in Plaintiff's ability to ask simple questions or request assistance.  In explaining these findings, Dr. Springer noted that chronic pain was high and interfered with concentration, memory and causes fatigue.

That same date Dr. Springer also completed a form entitled "Clinical Assessment of Pain" in which based on Plaintiff's subjective complaints and the objective evidence Dr. Springer rated Plaintiff's pain as severe profound pain that is virtually incapacitating so that Plaintiff cannot perform most activities of daily living and could not perform most activities at work. (R. 528-32.)  Dr. Springer further noted that with pain medications, Plaintiff would still experience marked pain which interferes with concentration, persistence, and pace and prevents Plaintiff from completing tasks relating to the activities of daily living and would prevent Plaintiff from completing tasks at work and that moderate side effects can be expected, which will only mildly interfere with Plaintiff's concentration, persistence and pace in performing activities of daily living or work.  When asked how he would expect a job that allowed Plaintiff to alternately sit or stand at will to effect Plaintiff's level of pain, Dr. Springer responded that marked increased pain is likely to occur to such a degree as to prevent the patient from alternately sitting and standing at will for more than 3 to 4 hours a day, 5 days a week. When asked how he thought a job that required Plaintiff to walk would effect Plaintiff's level of pain, Dr. Springer responded that marked increased pain is likely to occur to

such a degree as to prevent Plaintiff from walking for more than 3 to 4 hours a day, 5 days a week.

The ALJ appears to discredit these opinions based on the substance of subsequent reports by Dr. Springer. (R. 618.)  However, every treatment record identified by the ALJ actually *pre-dated* the Mental RFC Assessment and "Clinical Assessment Of Pain."   Moreover, even though Dr. Springer's treatment notes reflect some improvement over time, it does not necessarily follow that Dr. Springer's treatment notes are inconsistent with his opinions in the Mental RFC Assessment and "Clinical Assessment Of Pain."

Dr. Lafferty completed a pain assessment questionnaire on June 16, 2004 in which he commented on Plaintiff's condition from December 1, 2001 to present.  (R. 650-55.)   While there are no treatment records in the file, Plaintiff testified that he had been treated by Dr. Lafferty for pain since 2001.  (R. 616, 678.)  The ALJ did not articulate any basis for not crediting Dr. Lafferty's opinions.  Although Dr. Lafferty only rated Plaintiff's pain as "marked" (while Plaintiff rated it as "extreme"), a rating of "marked" pain still refers to pain that "interferes with concentration, persistence and pace and prevents Plaintiff from completing tasks relating to the activities of daily living without frequent (hourly) interruptions for pain relief; and, that assuming an 8 hour work day 5 days a week (with a 10-15 minute break in the morning and a 10-15 minute break in the afternoon and a 30 minute lunch break) would prevent the patient from completing tasks at work without frequent breaks or interruptions for pain relief. "

Dr. Lafferty found numerous other restrictions – i.e., marked restrictions in Plaintiff's ability to complete a normal workday and workweek without interruptions from pain and to perform at a consistent pace without an unreasonable number and length of rest periods; moderate restrictions in the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; and mild restrictions in his ability to maintain attention and concentration for extended periods, i.e., more than 5-10 minutes at a time and in his ability to interact appropriately with the general public.

The ALJ did not consider what impact these limitations identified by Dr. Lafferty and Dr. Springer would have on Plaintiff's ability to perform a full range of light work. Because the "grid" regulations did not adequately address the limitations identified by Dr. Lafferty and Dr. Springer, the ALJ was required to obtain vocational expert testimony.   Accordingly, this matter is due to be remanded for the ALJ to reconsider, with vocational expert testimony, whether Plaintiff can perform other work which exists in the national economy.

## V.  <u>CONCLUSION</u>

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the Administrative Law Judge to reconsider, with vocational expert testimony, whether Plaintiff can perform other work in the national economy, and to conduct any additional proceedings the Commissioner deems

appropriate. The Clerk is directed to enter final judgment consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 30, 2008.

Copies to:
    All Counsel

GARY R. JONES
United States Magistrate Judge